DEC 28 2023 PM12:51
FILED - USDC - FLMD - ORL

# UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF FLORIDA
## Orlando Division

CASE No. _____

---

ELIEZER TAVERAS, AND
VALERIA R. TAVERAS

     *Plaintiffs*
     *v.*

THE STATE OF FLORIDA;
ASHLEY MOODY, IN HER OFFICIAL
CAPACITY AS ATTORNEY GENERAL OF
THE STATE OF FLORIDA;
THE HONORABLE CHRISTINE ARENDAS,
CIRCUIT JUDGE OF THE CIRCUIT COURT
OF THE NINTH JUDICIAL CIRCUIT IN AND
FOR OSCEOLA COUNTY, FLORIDA;
SERVIS ONE, INC., DBA BSI FINANCIAL
SERVICES;
CHRISTIANA TRUST, A DIVISION OF
WILMINGTON SAVINGS FUND SOCIETY,
FSB, NOT IN ITS INDIVIDUAL CAPACITY,
BUT AS TRUSTEE OF ARLP TRUST 4;
FAY SERVICING, LLC.;
U.S. BANK, NATIONAL ASSOCIATION AS
LEGAL TITLE TRUSTEE FOR TRUMAN 2016
SC6 TITLE TRUST;
RUSHMORE LOAN MANAGEMENT
SERVICES, LLC.

---

## COMPLAINT FOR INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT
## CHALLENGE TO THE CONSTITUTIONALITY OF STATE STATUTE, CUSTOM AND POLICY
## AND OTHER RELIEFS
### Jury Trial Demanded

Plaintiffs, Eliezer Taveras, and Valeria Taveras (collectively referred to as "The Taveras" or "Plaintiffs"), bring forth this action against a group of defendants comprising the State of Florida; Ashley Moody, Attorney General Of The State Of Florida, the Honorable Christine Arendas, Circuit Judge Of The Circuit Court Of The Ninth Judicial Circuit In And For Osceola County, Florida; Servis One, Inc., DBA BSI Financial Services; Christiana Trust, A Division Of Wilmington Savings Fund Society, FSB, Not In Its Individual Capacity, But As Trustee Of ARLP Trust 4; Fay Servicing, LLC.; U.S. Bank, National Association As Legal Title Trustee For Truman 2016 SC6 Title Trust; and Rushmore Loan Management Services, LLC.

This lawsuit is grounded in the constitutional provisions of Article III, Section 2 of the United States Constitution and 42 U.S. Code 1983, addressing violations of the Fifth and Fourteenth Amendments. The Taveras assert that their constitutional rights have been infringed under color of state law, policy, and custom. Additionally, the action invokes the Racketeer Influenced and Corrupt Organizations Act (RICO), the Fair Debt Collection Practice Act, and other relevant Florida and Federal laws, seeking various forms of relief including declaratory and injunctive relief, restitution, and damages. The Taveras challenge deeply entrenched discriminatory policies maintained by the State of Florida and the Circuit Court of the Ninth Judicial Circuit, alleging systematic deprivation of their constitutional rights. This civil action is distinct from an interlocutory

appeal of an administrative proceeding; it directly challenges ongoing unlawful and unconstitutional conduct based on state court policies that impair The Taveras' ability to defend themselves, contravene federal statutes, and infringe upon their due process rights.

Contemporaneously with this Complaint, the Taveras have filed a notice of lis pendens in Osceola County, Florida, in accordance with Fla. Stat. 48.23 and F.S. 817.535(8), describing the real property affected by this lawsuit. Plaintiffs affirm that all conditions precedent to filing and maintaining this action have been met.

## INTRODUCTION

1.    Plaintiffs bring forth this solemn challenge against deeply entrenched and discriminatory policies upheld by the State of Florida, and the Circuit Court of the Ninth Judicial Circuit in and for Osceola County, Florida (the "State Court"). These policies, through their application and enforcement, have systematically deprived The Taveras, among others, of their constitutionally guaranteed rights, casting a shadow on the principles of justice and equality that form the bedrock of our legal system.

2.    This civil action is not an interlocutory appeal of an administrative proceeding; instead, it is an action challenging ongoing unlawful and unconstitutional conduct based on a state court's unconstitutional policies, that impaired and continue to impair the ability of The Taveras to properly defend themselves, contravenes federal statutes, and directly encroaches upon The

Taveras´s due process rights assured under the United States Constitution.

3.     For over six years, The Taveras have been victims of a well-orchestrated scheme constituting violations of federal law, the U.S. Constitution, and their human rights as guaranteed under the International Covenant on Civil and Political Rights (ICCPR). This scheme, involving corporations, accountants, attorneys, and state and federal actors, is accused of manipulating legal and financial processes for unlawful gain, causing substantial injury to The Taveras.

4.     Multiple actors, including several corporations, accountants, attorneys, Florida and federal actors, seem to have engaged in a deliberate and coordinated effort to manipulate and exploit legal and financial processes for unlawful gain, to the injury of The Taveras.

5.     Defendants' **ongoing** infringement of Plaintiffs' constitutional rights, has caused and continue to cause substantial injury to Plaintiffs.

6.     The Taveras are being prosecuted in a sham foreclosure action by predatory institutions using: (1) a forged promissory note; (2) false and fraudulent assignments of note and mortgage; (3) through the use of perjured documents and complaints containing false statements of fact and law, relevant to the State Court's determination of reliability, credibility, and trustworthiness of business records entered into evidence.

7.     Several circuit judges of the State Court presided over the sham foreclosure action, **until it was removed to this federal court under 28 U.S. Code § 1443** (this Court Case No. 6:23-cv-01493-WWB-RMN),

4

nevertheless, Chad Alvaro, a judge previously serving in the State Court, in a complete disregard of the rule of law, in bad faith, and completely exceeding his jurisdiction, continued to hear a motion for summary judgment previously filed by the foreclosure plaintiff, with the intent to block The Taveras' legal right to seek relief in this court, and to favor the foreclosure plaintiff.

8. On information and belief, Judge Alvaro was transferred to the circuit court in Orange County, Florida, and the case was assigned to Defendant, Judge Christine Arendas, to continue the sham foreclosure action, despite being completely deprived of jurisdiction.

## JURISDICTION AND VENUE

9. The jurisdiction of the Court is established under 28 U.S.C. § 1331, extending to cases arising under the U.S. Constitution and laws of the United States, under 42 U.S.C. § 1983, and 28 U.S.C. § 1343. The Court is also vested with the authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure Rule 57. Additionally, the Court has original jurisdiction over this action under the principle of Alienage Jurisdiction, pursuant to 28 U.S.C. § 1332(a), and can hear all state law claims under the doctrine of supplemental jurisdiction. Venue is deemed proper in the Middle District of Florida under 28 U.S.C. § 1391(b)(2).

10. Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred or will occur in this District or Division.

11.     A three-judge court is required pursuant to 28 USC § 2281.

## THE PARTIES

### PLAINTIFFS

12.     Plaintiff, Eliezer Taveras, is a natural person, a citizen of the United States of America, and a permanent resident of Madrid, Spain. He is sui juris.

13.     Plaintiff, Valeria Rosa Taveras a/k/a Valeria Taveras is a natural person, a citizen of the United States of America, and a permanent resident of Madrid, Spain. She is sui juris.

### DEFENDANTS

### a. THE STATE DEFENDANTS

14.     The State of Florida is the state of Florida.

15.     Defendant, Ashley Moody, is the Attorney General of Florida, the chief legal officer of the state. Fla. Const. Art. IV, § 4(b). Ashley Moody is being sued in her Official Capacity as Attorney General of The State Of Florida.

16.     The Attorney General is required to appear in the courts on behalf of the State of Florida. Fla. Stat. § 16.01(4).

17.     Defendant, the Honorable Christine Arendas, is a Circuit Judge Of The Circuit Court Of The Ninth Judicial Circuit In And For Osceola County, Florida. Judge Arendas is being sued in her official capacity.

18.     Under Florida Constitution, Article V, Florida Statutes, Florida Rules of Judicial Administration, the Florida Supreme Court's decisions serve as binding precedent on all lower state courts, including circuit courts; further, the

State Court is generally bound by the decisions of higher courts within its jurisdiction.

19.     Judge Arendas is statutorily tasked with enforcing the challenged policy(s), possesses the authority to enforce the challenged policy(s), and has a sufficient connection to the enforcement of the challenged policy(s); and, as demonstrated herein, she comes into conflict with the superior authority of the Constitution.

20.     Additionally, Judge Arendas is acting in the State Court ruling on a complaint against The Taveras, clearly exceeding the judge's jurisdiction.

21.     Furthermore, this lawsuit seeks nothing else than an order from this Court to the Judge, to do nothing more than uphold federal law under the Supremacy Clause.

22.     This suit against the State of Florida, Asley Moody, and Judge Arendas (jointly the "State Defendants"), only seeks prospective relief to redress an ongoing violation of federal law and the US Constitution.

23.     Although the State Defendant(s) might be entitled to sovereign immunity, the *Ex Parte Young* exception applies. *Ex parte Young*, 209 U.S. 123 (1908).

24.     Furthermore, the declaratory and injunctive relief sought by The Taveras is authorized by the exceptions of 28 U.S.C. § 2283.

### b. THE ENTERPRISE DEFENDANTS

25.     For the sake of judicial economy and efficiency, the Plaintiffs are

consolidating their efforts by bringing an independent lawsuit against additional defendants alongside their challenge to the constitutionality. This strategic approach is designed to comprehensively protect their rights and address all related legal issues in a unified legal action, thereby streamlining the process and ensuring a more cohesive and effective legal response to their situation.

26.    Accordingly, this lawsuit is also brought against Christiana Trust, a Division of Wilmington Savings Fund Society, FSB, Not in Its Individual Capacity, But as Trustee of ARLP Trust 4 ("Cristiana Trust"). The Trustee, Christiana Trust a division of Wilmington Savings Fund Society, FSB, is a federal savings bank with its principal place of business in the County of New Castle, State of Delaware.

27.    Defendant, Servis One Inc., DBA BSI Financial Services ("BSI"), is a foreign profit corporation, incorporated in the State of Delaware, but with its principal place of business in Irving, Texas. BSI is a mortgage servicer and a debt collector. BSI's servicing obligations and activities include those performed pursuant to a sub-servicing contract.

28.    Defendant, Fay Servicing, LLC. ("Fay"), is a mortgage servicer and a debt collector. Fay's servicing obligations and activities include those performed pursuant to a sub-servicing contract. Fay's Headquarters are located in Tampa, Florida.

29.    Defendant,    Rushmore    Loan    Management    Services    LLC ("Rushmore") is a mortgage servicer and a debt collector. Rushmore's servicing

obligations and activities include those performed pursuant to a sub-servicing contract. Rushmore's main office is located in Irvine, CA.

30. U.S. Bank, National Association As Legal Title Trustee For Truman 2016 SC6 Title Trust ("US Trust") is a trust. The Trustee, U.S. Bank, National Association is a national bank whose headquarters is located at 425 Walnut St, Cincinnati, OH 45202.

31. Defendants, BSI, Christiana Trust, US Trust, Fay, and Rushmore (hereinafter jointly the "Enterprise Defendants") engage in substantial and not isolated activities within the State of Florida.

32. All Enterprise Defendants engage in trade or commerce.

## THE RICO ENTERPRISE

33. Defendants, Christiana Trust, BSI, U.S. Trust, Fay, and Rushmore created and conducted an association-in-fact enterprise (the "Enterprise"), which might substantially change its membership over time, and might include other unspecified persons or entity members like attorneys, public notaries, accountants, collectors, and others unknown persons.

34. At all times relevant herein, the Enterprise was an "enterprise", as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c), engaged in, or the activities of which affect interstate commerce.

35. The members of the Enterprise might change roles from time to time, but the overall enterprise remains intact in general form and purpose, directed toward an economic goal: the acquisition of title to, right, or interest in

real property.

36.     As a whole, the Enterprise Defendants acted jointly, with very well-defined ongoing roles in the organization.

37.     Christiana Trust, at all relevant times, was the principal of, exerted control over, and directed the operations of Enterprise and each of its component parts.

38.     Defendants, BSI, US Trust, Fay, and Rushmore were employed by or associated with Enterprise and its component parts and participated in the conduct of its affairs.

39.     The intertwined actions, conducted in concert by the Enterprise Defendants, are emblematic of a concerted effort to cause harm and injury to The Taveras. By orchestrating a web of deceitful practices and manipulating legal proceedings through a series of interconnected actions, the Enterprise has substantially damaged The Taveras' rights, business interests, and legal standing, triggering serious implications under federal RICO statutes and federal laws.

## PERTINENT PROVISIONS

40.     Under 18 U.S.C. § 1962(c), "it shall be unlawful for any person employed by . . . any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . .", including violation, or conspiracy to violate 18 U.S. Code 1341, 18 U.S. Code 1344, between others.

10

41.     The use of the mails in conjunction with a scheme to defraud is a criminal act in violation of the Federal Mail Fraud Statute, 18 U.S.C. § 1341, punishable by up to 20 years in prison.

42.     Under the provisions of 18 U.S.C. § 371, it is explicitly established as a federal criminal offense to conspire to violate the mail fraud statute, as codified in 18 U.S.C. § 1341.

43.     Under 18 U.S.C. § 1344, it is unlawful, punishable for up to $1,000,000 or imprisonment for up to 30 years, or both, to knowingly execute, or attempt to execute, a scheme or artifice to defraud a financial institution.

44.     The wire fraud statute, as codified in 18 U.S.C. § 1343,  makes it a crime to execute, or attempt to execute, a scheme to defraud or to obtain money or property by means of false or fraudulent pretenses, representations, or promises, through the use of wire, radio, or television communications in interstate or foreign commerce.

45.     18 U.S.C. § 1962(d) specifically makes it unlawful for any person to conspire to violate any of the substantive provisions of RICO.

46.     Any act which is indictable under the provisions of 18 U.S.C. § 1341, § 371, 1343, and 1344, is a "racketeering activity", as that term is defined in 18 U.S.C. § 1961(1)(B).

47.     Under 18 U.S.C. § 1961(5) two or more acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the

11

commission of a prior act of racketeering

48.     The Due Process Clause of the Fourteenth Amendment states: "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, s 1. The Fourteenth Amendment also provides that "[N]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."

49.     The Fifth Amendment also requires that "due process of law" be part of any proceeding that denies a citizen "life, liberty or property". U.S. Const. Amend. V. The Fifth Amendment's Due Process Clause, as interpreted by the Supreme Court, also provides the protection of substantive due process, which protects individuals against majoritarian policy enactments that exceed the limits of governmental authority.

50.     The Civil Rights Act of 1964 prohibits discrimination on the basis of race, color, religion, sex, or national origin.

51.     The Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27 (now REv. STAT. §§ 1977-78 (1875), 42 U.S.C. §§ 1981-82 (1964)), reads in part:

> "[All United States] citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude . . . shall have the same right, in every State and Territory in the United States, **to make and enforce contracts, to sue,** be parties, and give evidence, to inherit, purchase, lease, sell, hold, **and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property**, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary

notwithstanding." (Emphasis added).

52.     The ICCPR is a key international human rights treaty, providing a range of protections for civil and political rights. The ICCPR obligates countries that have ratified the treaty to protect and preserve basic human rights. The United States ratified the ICCPR in 1992.

53.     Upon ratification, the ICCPR became the "supreme law of the land" under the Supremacy Clause of the U.S. Constitution, which gives ratified treaties the status of federal law. However, the U.S. Senate attached a "non-self-executing" declaration to the ICCPR. Thus, while part of U.S. law, the provisions of the ICCPR are not directly enforceable in U.S. courts without implementing legislation.

54.     The Taveras are grounding their causes of action in U.S. laws that reflect the principles of the International Covenant on Civil and Political Rights (ICCPR). Simultaneously, they are underscoring alleged violations of the ICCPR to draw the court's focused attention to the serious infringement of their rights. This dual approach aims to underscore the obligation of the United States, and by extension, the State of Florida, to respect and ensure the rights recognized in the ICCPR to all individuals within its territory and jurisdiction, without discrimination.

55.     The Taveras' legal strategy seeks to remind the Court of the United States' commitment as a signatory to the ICCPR, emphasizing the necessity for an effective remedy for rights violations, even when these are committed by persons

acting in an official capacity. This lawsuit is not merely a pursuit of individual justice; it is a concerted effort to reinforce the state's broader responsibility to uphold fundamental human rights as recognized on an international scale, urging the Court to recognize and fulfill this duty in the context of the challenged policies.

56.     Under Article 14 of the ICCPR, "All persons shall be equal before the courts and tribunals." And is "entitled to a fair and public hearing by a competent, independent, and impartial tribunal established by law." Under Article 16 of the ICCPR, "Everyone shall have the right to recognition everywhere as a person before the law." Under Article 17 of the ICCPR, "No one shall be subjected to arbitrary or unlawful interference with his privacy, family, home or correspondence. . . Everyone has the right to the protection of the law against such interference or attacks." Under Article 26 of the ICCPR, all persons are equal before the law "and are entitled without any discrimination to the equal protection of the law."

## THE CHALLENGED LAWS, CUSTOMS, AND POLICIES

## A. THE BARTRAM POLICY

57.     In 2014, the Florida Fifth District Court of Appeals (the "5DCA") made its decision in *U.S. Bank Nat'l Ass'n v. Bartram*, 140 So. 3d 1007, 1013-14 (Fla. 5th DCA 2014) (holding bank's acceleration of the payments due under promissory note, in mortgage foreclosure action that was ultimately dismissed for failure to prosecute, did not trigger the five-year statute of limitations with

respect to the accelerated payments, so as to prevent a subsequent foreclosure action based on payment defaults occurring after dismissal of the first foreclosure action; each new default created a new cause of action, causing the statute of limitations to begin to run).

58.    Eventually, the *Bartram* case went to the Florida Supreme Court.

59.    On Nov. 3, 2016, the Florida Supreme Court issued its decision in *Bartram v. U.S. Bank National Association,* No. SC14-1265, 2016 WL 6538647 (Fla. Nov. 3, 2016), confirming the lender's allegations that the filing of a foreclosure action does not change the installment nature of the debt, in which in a new and separate default occurs each time the borrower misses a monthly payment, and that a new foreclosure action is not time barred, so long as the missed monthly payment forming the basis of the new action falls within the five-year limitations period.

60.    In its decision, the Florida Supreme Court held that "absent a contrary provision in the residential note and mortgage, dismissal of **the foreclosure action against the mortgagor has the effect of returning the parties to their pre-foreclosure complaint status**, where the mortgage remains an installment loan and the mortgagor has the right to continue to make installment payments without being obligated to pay the entire amount due under the note and mortgage." *Bartram*, 2016 WL 6538647 at *1 (emphasis added).

61.    Accordingly, if the borrower defaults again after the action is

dismissed and fails to cure the default, the lender is not barred from filing a second or subsequent foreclosure action "if the alleged subsequent default occurred within five years of the subsequent foreclosure action." Id. at *3.

62.     The Bartram's decision has established a policy (the "Bartram Policy"), that when applied to The Taveras's context deprive them of their constitutional rights of due process and equal opportunity of the law, as well as their human rights guaranteed under the ICCPR.

63.     The Bartram Policy, as derived from the Florida Supreme Court's decision, fundamentally reinterprets the dynamics of mortgage loan agreements in the context of defaults and foreclosures. It establishes that each missed mortgage payment post-dismissal of a foreclosure action constitutes a new default, thereby allowing lenders to initiate subsequent foreclosure actions for each new default within a five-year statute of limitations.

64.     This policy effectively maintains the mortgage as an installment loan, even after the lender has exercised its rights to accelerate the mortgage and the borrower has not exercised his/her rights to reinstate, and resets the statute of limitations with each new "default", thereby allowing for continuous legal action against borrowers.

65.     In the specific case of The Taveras, the implications of the Bartram Policy are profound, essentially negating the effect of an acceleration clause typically found in mortgage agreements. The Bartram Policy effectively strips the acceleration clause of its power, undermining the lender's ability to enforce the

full loan repayment immediately upon default. In The Taveras' situation, this not only diminishes the effectiveness of the acceleration clause but also challenges the foundational terms of the Mortgage itself, altering the traditional enforcement mechanisms and expectations inherent in such agreements.

66. The Plaintiffs recognize that the principles outlined in the Bartram Policy are not isolated to this singular decision but are echoed in numerous rulings of the Florida Supreme Court and several Courts of Appeal of the State of Florida.

67. This acknowledgment underscores the widespread judicial acceptance and application of the policy across Florida's legal landscape. The consistent reinforcement of this policy in various high-level court decisions highlights its foundational role in shaping the state's approach to mortgage loan defaults and foreclosure proceedings. This broad judicial consensus cements the Bartram Policy as a significant legal precedent, influencing the interpretation and enforcement of mortgage agreements and acceleration clauses across numerous cases beyond the Bartram decision.

68. Therefore, the Plaintiffs' challenge extends beyond the specific ruling in Bartram; they are contesting the broader policy established in this and other judicial decisions that effectively nullify key provisions of the contract, specifically the Mortgage. Their contention is rooted in the belief that this policy, as applied in Bartram and reinforced in subsequent rulings, undermines the contractual integrity of the Mortgage by diminishing the enforceability of its

terms, such as the acceleration clause.

69.    By challenging this policy, the Plaintiffs are not only questioning the outcome of a single case but are also confronting a legal precedent that has significant implications for the sanctity and operational efficacy of mortgage contracts across Florida. Their argument underscores a deeper concern about the balance of rights and obligations as originally stipulated in mortgage agreements, which they believe are being eroded by this evolving judicial interpretation.

70.    The Bartram policy has precipitated a cascade of substantial damages to the Plaintiffs, Eliezer and Valeria Taveras, as detailed in this complaint. This policy, by its very nature, has effectively opened the floodgates for a series of violations against the Plaintiffs' rights. It has laid the groundwork for the prolonged and unjust foreclosure proceedings they have endured, underpinned by a series of fraudulent and deceptive practices. The policy's application has led to the Plaintiffs facing wrongful foreclosure actions, based on forged documents and misrepresentations, which have not only threatened their property rights but also inflicted severe emotional and financial distress. The relentless pursuit of these actions against the Plaintiffs, facilitated by the Bartram policy, has resulted in a protracted legal battle, draining their resources and causing significant personal and psychological harm. In essence, the Bartram policy has been instrumental in enabling and perpetuating the series of rights violations that the Plaintiffs have grievously suffered.

## B. THE WILSON POLICY

71.    On May 9, 2001, the Florida Fourth District Court of Appeals (the "4DCA") made its decision in *Hunnewell v. Palm Beach County*, 786 So. 2d 4 (Fla. 4th DCA 2000).

72.    Elwood J. Hunnewell, Jr., sought certiorari review of a circuit court's appellate decision entered while a notice of removal to federal court was pending. He claimed that the decision entered during removal was absolutely void. The 4DCA held that "Because the removal to federal court was improper, the court's decision was not void."

73.    The 4DCA followed Florida Supreme Court precedent, in *Wilson v. Sandstrom*, 317 So.2d 732, 740 (Fla.1975), where the Supreme Court held that "[w]hen removal is shown to be improper the State court's actions are not void."

74.    The decision in *Hunnewell v. Palm Beach County* and its precedent *Wilson v. Sandstrom* has led to the establishment of what can be termed the "Willson Policy". This policy, as interpreted by the State Court, diverges from the well-established rule and the provisions of 28 U.S.C. § 1446(d), which state that removal to federal court effectively suspends the jurisdiction of a state court **until** an order of remand is issued.

75.    Under the Wilson Policy, as interpreted and applied by the State Court and the State of Florida, there is an emerging practice where Florida courts are granted the discretion to determine the propriety of a case's removal to federal court. This policy implies that state courts, including their judges, are

encroaching upon a domain traditionally reserved for the federal judiciary, encompassing district courts and courts of appeal. This shift not only blurs the jurisdictional lines between state and federal courts but also raises critical concerns about the principles of federalism, which dictate a clear demarcation and balance of powers between state and federal governmental functions.

76. Moreover, the Wilson Policy suggests that state courts in Florida have the authority to overrule or disregard the provisions of 28 U.S.C. § 1446(d), which traditionally hold that the jurisdiction of a state court is suspended upon the removal of a case to federal court until an order of remand is issued. In deciding to continue adjudicating cases as if they were never removed to federal jurisdiction, state courts are potentially undermining the established framework of federalism, which is foundational to the United States legal system.

77. This approach challenges the Constitution's grant of federal question jurisdiction, extending to cases 'arising under' the Constitution, laws, and treaties of the United States, even when such cases are initially filed in state courts. The implication of this policy represents a significant departure from the established norms of federal-state relations, potentially infringing upon the federal judiciary's exclusive domain and disrupting the delicate balance between state and federal judicial authorities.

78. It's important to consider the financial implications of the Willson Policy. Allowing state courts to proceed with cases that might later be deemed improperly removed to federal court exposes litigants to unnecessary financial

burdens. This situation runs counter to Rule 1 of the Federal Rules of Civil Procedure, which aims to secure a just, speedy, and inexpensive resolution of every action and proceeding. This not only strains the resources of the parties involved but also contradicts the fundamental objective of the federal rules to streamline and economize the litigation process. Therefore, the continuation of the Willson Policy risks undermining the efficiency and cost-effectiveness that the federal legal system strives to uphold.

79.    The Willson Policy, as it currently stands, raises a grave and dramatic risk: it opens the door for state courts to make decisions that could be exceedingly difficult, if not impossible, to reverse.

80.    In The Taveras' case, the application of the Wilson Policy by the State Court has led to a precarious and potentially irreversible situation. Despite the foreclosure case's removal to federal court, the State Court proceeded to hear the matter, culminating in the granting of a motion for summary judgment and the ordering of a foreclosure sale of The Taveras' real property. This decision can result in the transfer of title to a new individual, an action that poses significant challenges to reverse.

81.    The implications of such a decision extend far beyond the immediate parties involved, potentially impacting a considerable number of individuals and families. The issuance of a new title under these circumstances sets a concerning precedent where state court actions, taken in contravention of federal jurisdictional mandates, could lead to substantial and lasting consequences on

property rights and familial stability.

82.    This precarious situation places litigants in a perilous position, where the very fabric of their constitutional rights hangs in the balance. The specter of irreversible state court rulings, made while federal jurisdiction is ambiguously suspended, threatens the sanctity of due process and the equitable administration of justice. Litigants, caught in the crossfire of jurisdictional uncertainty, face the alarming prospect of having their rights irreparably compromised. This policy, therefore, not only challenges the procedural integrity of the judicial system but also casts a long, ominous shadow over the fundamental rights that are the cornerstone of American jurisprudence. The potential for such irreversible harm underscores the urgent need for a reevaluation of this policy, to safeguard the constitutional protections that every litigant is rightfully entitled to under the law.

83.    In the specific case of The Taveras, the State Court has applied this policy even in the context of a property rights dispute, seemingly disregarding the heightened level of care and consideration mandated by the Fourteenth Amendment to the United States Constitution. Despite the constitutional imperative that requires state courts to exercise special or extreme care in matters involving property rights, the State Court's adherence to the Wilson Policy has led to decisions that appear to overlook these constitutional protections.

84.    This approach raises significant concerns about the court's

22

commitment to upholding the due process guarantees enshrined in the Fourteenth Amendment, particularly in cases where fundamental property rights are at stake. The application of the Wilson Policy in such a context not only challenges the principles of federalism but also calls into question the court's adherence to the constitutional mandate to protect individual rights against state encroachment.

85.    The Plaintiffs acknowledge that the Willson Policy is not unique to these cases but is reflected in several decisions of the Florida Supreme Court and various Courts of Appeal. This recognition indicates that the policy has broader implications and acceptance within the Florida judicial system, affecting the interpretation and application of federal jurisdictional rules in state court proceedings. The widespread adoption of this policy in Florida's legal landscape suggests a significant deviation from the conventional understanding of federal and state court jurisdictions as delineated by federal statutes.

86.    Therefore, the Plaintiffs are challenging not just the specific ruling in *Hunnewell* but also the broader policy established in this and other decisions. Plaintiffs assert that this policy effectively nullifies the provisions of 28 U.S.C. § 1446(d), which clearly demarcate the suspension of state court jurisdiction upon removal to federal court.

87.    By contesting this policy, the Plaintiffs are confronting a legal precedent that they believe improperly overrides the established federal jurisdictional framework, potentially leading to jurisdictional conflicts and

undermining the authority of federal statutes in determining the scope of federal and state court jurisdictions.

## A. THE FLORIDA POLICY

88.    A narrowed decision in *Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. United States Fire Ins. Co.*, 639 So. 2d 606, 608 (Fla. 1994), has led to a policy (the "Florida Policy"), further shaped by subsequent rulings such as *Echevarria, et al. v. Cole*, 950 So. 2d 380, 384 (Fla. 2007), that has established a broad application of the litigation privilege in Florida.

89.    Initially, under the principle of litigation privilege parties and their attorneys would have absolute immunity for communications made during judicial proceedings, provided they bear some relation to the proceedings. Nevertheless, initially developed to protect against defamation liability, the Florida litigation privilege has been extended to encompass all acts related to and occurring within judicial proceedings.

90.    The expansive scope of the Florida Policy, as applied, has led to a situation where foreclosure plaintiffs, among others, are afforded a litigation privilege that shields them from liability for a range of actions, including misrepresentations, fraud, and perjury, committed in the course of litigation. This across-the-board application of the privilege, as upheld in cases like *Echevarria* and *Sun Life*, suggests a judicial environment where the privilege is not only a shield against defamation but also a potential tool for broader immunity in litigation-related conduct.

91.     The application of the Florida Policy, particularly in its broadest form, raises significant constitutional concerns under the United States Constitution. By granting sweeping immunity to litigation participants, especially in foreclosure proceedings, the policy potentially infringes upon the constitutional rights of citizens. The policy's potential to shield fraudulent or perjurious actions in judicial proceedings undermines the fundamental constitutional guarantee of legal redress and accountability, calling into question the balance between litigation privilege and the preservation of constitutional rights.

92.     The Taveras recognize that recent jurisprudential developments, as exemplified in cases such as *Debrincat v. Fischer*,[1] reflect a judicial reevaluation of the boundaries of litigation privilege. These developments indicate a growing awareness within the judiciary of the need to reassess the scope of this privilege, particularly concerning long-established causes of action like malicious prosecution.

93.     However, despite these progressive shifts in legal interpretation, the application of the litigation privilege appears to persistently favor foreclosure plaintiffs. This ongoing bias in its application raises concerns about the equitable administration of justice, particularly in foreclosure proceedings, where the privilege continues to be used as a shield for actions that might otherwise be subject to legal scrutiny and accountability

---

[1] *Debrincat v. Fischer*, 217 So. 3d 68 (Fla. 4th DCA 2017).

94.     In their legal challenge, The Taveras are confronting the Florida Policy, as it appears to underpin the subsequent and related 'Osceola Policy.' This foundational policy, stemming from the interpretation of litigation privilege in Florida, has set a precedent that the State Court seems to have adopted and applied in its own proceedings. The Taveras argue that this policy, as it is being implemented, allows for and even endorses a range of questionable legal practices, including misrepresentations and acts of fraud within the judicial process.

95.     By challenging the Florida Policy, The Taveras aim to address not only the specific issues they have faced but also the broader implications of such a policy on the integrity of judicial proceedings and the protection of constitutional rights in the State of Florida.

96.     The Florida policy has had a profound and detrimental impact on the Plaintiffs, Eliezer and Valeria Taveras, contributing significantly to their ongoing legal and personal struggles. This policy, by extending litigation privileges indiscriminately, has effectively sanctioned a judicial environment where foreclosure plaintiffs can engage in fraudulent, deceptive, and even criminal activities with impunity. As a direct consequence, the Plaintiffs have been subjected to a series of unjust and unlawful foreclosure actions, underpinned by forged documents and fraudulent representations. This policy has not only facilitated the violation of the Plaintiffs' property rights but has also led to considerable emotional distress, financial hardship, and a pervasive sense of

injustice. The Florida policy's broad application in litigation, particularly in foreclosure cases, has allowed for a gross miscarriage of justice, leaving the Plaintiffs to bear the brunt of its unfair and unconstitutional implications. Furthermore, the Florida Policy serves as the foundation for the even more pernicious 'Osceola Policy.' In summary, the Florida policy has played a critical role in perpetuating the legal challenges and rights violations that the Plaintiffs have been forced to endure.

## D. THE OSCEOLA POLICY

97. Pursuant to Article V of the Florida Constitution, state courts possess explicit authority over defendants in civil litigation matters. The State Court is endowed with inherent and vested jurisdiction to formulate and implement procedural and practice rules as necessary for the efficient administration of justice. However, this judicial prerogative is circumscribed by the stipulation that such procedural rules must be subordinate to statutory law, with the latter prevailing in instances of conflict. Furthermore, any established custom, practice, policy, or procedural rule adopted by the State Court is inherently subordinate to the supremacy of the United States Constitution.

98. The State Court, exercising its explicit, inherent, and vested authority, has established and perpetuated a systemic pattern of conduct and procedural norms (hereinafter referred to as the "Osceola Policy"), which disproportionately and adversely impacts defendants in foreclosure proceedings, thereby infringing upon their federally protected rights.

99.    The Osceola Policy, as operationalized by the State Court, manifests in discriminatory, harassing, and prejudicial treatment of foreclosure defendants by judges, court assistants, and staff. This treatment is predicated on the presumption that failure to meet mortgage obligations is a grievous offense warranting any manner of fraudulent, illicit, or even criminal actions by foreclosure plaintiffs or their legal representatives as punitive measures against the debtor.

100.    In its application, the Osceola Policy effectively endows foreclosure plaintiffs with a litigation privilege, sanctioning the perpetration of systemic fraud, unlawful activities, and criminal conduct in the context of and in furtherance of litigation processes.

101.    The State Court's apparent leniency towards legal transgressions committed by foreclosure plaintiffs stands in stark contrast to its stringent stance against civilian infractions. This dichotomy contributes to the perpetuation of constitutional violations as experienced by The Taveras.

102.    Under the State Court's application of the Osceola Policy, foreclosure plaintiffs are afforded an implicit defense against allegations of forged notes and endorsements, fraud upon the court, submission of forged documents, fraudulent affidavits, counterclaims alleging fraud and racketeering, violations of the Federal Housing Administration (FHA) standards, Racketeer Influenced and Corrupt Organizations (RICO) Act violations, and related defense motions.

103.    The records of the State Court unequivocally evidence the existence

and active implementation of the Osceola Policy.[2]

104.   These records, meticulously maintained and publicly accessible, provide a clear and indisputable chronicle of the policy's influence on judicial proceedings within the court. The documentation within these records reveals a consistent pattern of decision-making that aligns with the principles and directives of the Osceola Policy, underscoring its pervasive impact on the judicial process.

105.   In a telling episode that further highlights the systemic nature of this issue, a previous general state attorney was formally notified about the rampant abuse of litigation privilege, by foreclosure plaintiffs, which allegedly involved multiple criminal activities.

106.   A request was made to convene a grand jury to investigate these serious allegations. However, this request was met with silence and inaction, a response that speaks volumes about the prevailing bias within the state's legal apparatus. This lack of response not only demonstrates a troubling indifference to potential judicial misconduct and criminal activity but also suggests a systemic bias within the Florida State judiciary, favoring foreclosure plaintiffs.

107.   Furthermore, the current attorney general, by virtue of her position and access to judicial records and reports, is or should be well aware of these ongoing practices.

108.   Despite this knowledge, there has been a conspicuous absence of

---

[2] https://workdrive.zoho.com/folder/5m24k5e96b5f55a6f4b7fb087683bba723c23

action or response from her office. This continued disregard for the alleged abuses under the Osceola Policy is a blatant demonstration of bias, further entrenching the favoritism shown towards foreclosure plaintiffs. Such inaction by the state's highest legal authority not only perpetuates the injustices faced by those entangled in foreclosure proceedings but also erodes public trust in the impartiality and integrity of the state's judicial system

109.   This litigation privilege represents a profound distortion of the rule of law, resulting in the infringement of the constitutional and civil rights guaranteed to all citizens of the United States, as well as rights enshrined in the ICCPR.

110.   The Osceola Policy, as it stands and as it has been applied within the State Court, has caused significant and lasting harm to the Plaintiffs, Eliezer and Valeria Taveras. This policy, characterized by its arbitrary and capricious application, has entrenched a system of judicial bias and discrimination, particularly in foreclosure proceedings. As seen below, the Plaintiffs have been subjected to a relentless series of unfair procedural rules and practices, including the suppression of their efforts to challenge fraudulent activities and the denial of their rights under Florida law. This policy has not only perpetuated a cycle of injustice but has also led to substantial personal and financial damages for the Plaintiffs. They have endured prolonged legal battles, emotional trauma, and considerable financial strain as a direct result of the Osceola Policy's implementation. The policy's discriminatory and biased application has

effectively stripped the Plaintiffs of their constitutional rights to due process and equal protection, leaving them to grapple with the consequences of a deeply flawed and prejudiced judicial system. The Osceola Policy, in its essence, represents a stark deviation from the principles of fairness and justice, inflicting irreparable harm on the Plaintiffs and undermining the integrity of the legal process.

## BACKGROUND

111.    On September 7th, 2006, The Taveras bought the property located at 7706 Excitement Drive Reunion FL 34747 (the "Property").

112.    The Property was sold by the sales team of Ginn Corporation ("Ginn"), the developer of Reunion Resort, FL., where the Property is located.

113.    Bank of America, N.A. ("BANA"), along with other lenders, partnered with Ginn as a preferred lender, providing financing options for buyers interested in properties located in Reunion Resort.

114.    In a calculated effort to lure buyers like The Taveras, Ginn Corporation spun an elaborate tale of an investment goldmine. They marketed the Property as a dual-purpose asset—suitable for personal use as a second home and a lucrative short-term rental via Reunion Resort's program.

115.    Ginn's persuasive sales pitch hinged on a purported 64% rental rate, a figure that later unraveled as a fabrication. Investigations revealed the stark reality: the actual rental performance languished at around 1-15%, a far cry from the misrepresented statistics. This deliberate misrepresentation left The Taveras

ensnared in a fraudulent transaction, hoodwinked by Ginn's misleading portrayal of the property's income potential. In addition, as it was the custom, policy, and practices of Ginn, The Taveras were victims of inflated appraisals, conducting them to buy the Property for an amount that didn't accurately reflect the true value of it.

116.    Moreover, The Taveras became casualties of a calculated strategy by BANA and Ginn Corporation. As a preferred lender in Ginn's projects, Bank of America was implicated in facilitating NO-DOC loans for buyers, including The Taveras, without adequate verification of financial documentation. These findings tied into a broader pattern of inflated property appraisals within Ginn's developments, portraying a collaborative effort aimed at enticing buyers into purchasing properties at values far beyond their actual worth.

117.    Accordingly, The Taveras purchased the Property and executed a mortgage in favor of BANA, bearing the loan number 6319977457, registered in Official Records of Osceola County, Book 3282, Page 429 (the "Mortgage").

118.    The Mortgage references a promissory note (the "Mortgage Note"), purportedly executed by Valeria Taveras. The Taveras are without knowledge if such promissory note exists.

119.    The Mortgage, a contract of adhesion, is definite and precise and reasonably susceptible to only one meaning: the lender rights and process to accelerate after the "Borrower's breach of any covenant or agreement in this Security Instrument," and the borrower rights and conditions to reinstate after

acceleration. Accordingly, Section 22 of the Mortgage, "Acceleration; Remedies" states:

> Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result **in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property**. The notice shall further inform Borrower of **the right to reinstate after acceleration** and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration **and** foreclosure. **If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and** may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

(Emphasis added). See Exhibit "1", Mortgage, Section 22.

120. In addition, the Reinstatement Clause [Mortgage, Section 19] provides as follows:

> **Borrower's Right to Reinstate <u>After Acceleration</u>**. If borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlies of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or

agreements; (c) pay all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonable require to assure that Lender's interest in the Property and rights under this Security Agreement, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. **Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred**. However, this right to reinstate shall not apply in the case of acceleration under Section 18 [Transfer of the Property or a Beneficial Interest in Borrower].

(See Exhibit "1" Mortgage, Section 19).

121.   As the housing market spiraled into a catastrophic downturn, The Taveras, like countless others, found themselves ensnared in financial turmoil. The property's value nosedived, leaving the couple grappling with a mortgage that far exceeded the property's actual worth. Despite their diligent attempts to keep up with payments, the plummeting market rendered the monthly mortgage payments unmanageable.

122.   In 2008, Ginn declared bankruptcy.

123.   On July 4, 2008, BANA, having extended the ill-fated NO-DOC loan to The Taveras, accelerated the Mortgage in accordance with the contract's provisions, declaring "the entire principal balance and all other sums recoverable under the terms of the promissory Note and Mortgage" due.

124.   Additionally, BANA initiated a foreclosure action against The Taveras in the State Court, under Case No. 2008CA5862 (the "BANA Foreclosure"), adding to The Taveras' distress during the economic downturn.

125.   BANA admitted that it did not have, or had "lost" the Mortgage Note.

126.   The Taveras' distressing battle against foreclosure by BANA coincided with a critical juncture for the financial institution. Under the weight of intense scrutiny stemming from widespread allegations of predatory lending practices, BANA was embroiled in the fallout of the National Mortgage Settlement. Sensing the need to evade further legal and public censure, BANA opted to discontinue the foreclosure action against The Taveras, a move perceived as an attempt to mitigate its involvement in the high-profile controversies surrounding mortgage malpractices.

127.   The BANA's foreclosure action was dismissed for lack of prosecution.

128.   The Taveras never exerted their rights to reinstate the Mortgage in accordance with the contract's provisions (Section 19 of the Mortgage).

## THE ENTERPRISE'S SCHEME

129.   To execute the scheme, in furtherance of the Enterprise's ultimate goal, for nearly nine years the Enterprise Defendants engaged in a pattern of racketeering activity, as follows:

130.   For the sake of the scheme to defraud, in order to take or acquire an interest in the Property, the Enterprise intentionally made representations of facts to Plaintiffs, the State Court, and the Fifth District Court of Appeals (the

"5DCA"), that were false, known to be false when made.

131.    Accordingly, on May 27, 2014, almost 6 years after the dismissal of BANA Foreclosure, BSI filed or caused to be filed an assignment of mortgage (the "BSI Assignment") in Official Records of Osceola County, FL, reflecting that BANA was assigning the Mortgage to "Christiana Trust a Division of Wilmington Savings Fund Society, FSB not in its Individual capacity but as Trustee of ARLP Trust 3" (hereinafter "Trust 3"). A corrective assignment was later filed, changing the assignee to "Christiana Trust a Division of Wilmington Savings Fund Society, FSB not in its Individual capacity but as Trustee of ARLP Trust 4" (hereinafter "Christiana Trust"). Both assignments lack details of the sale or transfer of the promissory note, raising doubts about their legitimacy. 3

132.    As noticed, there's a discrepancy in loan numbers between these assignments and the original Mortgage, suggesting potential violations of federal mortgage assignment laws and casting doubt on Christiana Trust's legal standing. The assignments reflect Loan Number 7130591790, while the Mortgage Loan number is 6319977457.

133.    On August 28, 2024, The Taveras filed a declaratory action against Christiana Trust in the State Court, under Case No. 2014CA002620 ("Declaratory Action"), seeking to declare the Mortgage null, void, and canceled, and not act as a valid encumbrance on the Property. On January 29, 2015, the State Court

---

3 The erroneous assignment of the mortgage by BSI, as evidenced in the May 27, 2014 filing, is a critical anomaly that demands scrutiny. This initial assignment erroneously designated 'ARLP Trust 3' as the assignee, an error later 'corrected' to 'ARLP Trust 4.' The repetition of this specific error in a subsequent assignment, purportedly involving BSI and Christiana Trust, is not only indicative of a pattern of inaccuracy but also raises serious concerns of notary fraud and potential subordination to perjury.

entered Final Default Declaratory Judgment (the "Declaratory Judgment") in favor of The Taveras, declaring the Mortgage null and void, and no act as a valid encumbrance against the Property. See Exhibit "2".

134.   Nevertheless, on February 25, 2015, Christiana Trust filed the notice of appeal to the 5DCA.

135.   As a critical component of the Enterprise's fraudulent strategy, BSI orchestrated the creation, or facilitated the creation, of a counterfeit promissory note (hereinafter referred to as the "BSI Note"), to be falsely portrayed as the authentic Mortgage Note. See Composite Exhibit "3".

136.   Crucially, this forged document included an unauthorized and counterfeit signature of Plaintiff Valeria Taveras on its final page (page 6/6), falsely implying her financial obligation to this illegitimate note. This deliberate act of forgery and misrepresentation was strategically executed to erroneously establish Ms. Taveras's liability, serving as a pivotal element in advancing the broader deceptive agenda of the Enterprise.

137.   BSI was or should have been, fully aware that the counterfeit promissory note would play a crucial role in legal proceedings, initially serving as a key instrument in seeking the reversal of the Declaratory Judgment. Beyond this immediate use, BSI was cognizant or reasonably should have been, that this falsified document was integral to the Enterprise's ultimate objective: the acquisition of the Property through a foreclosure action. This awareness underscores the deliberate nature of BSI's involvement in the fabrication of the

false note, highlighting its strategic role in the broader scheme orchestrated by the Enterprise.

138.   In advancing their fraudulent scheme, BSI produced or orchestrated the production of, an affidavit on June 22, 2015 (hereafter referred to as the "BSI Affidavit"), executed in the State of Texas by Manuel Villegas, an employee of BSI. Mr. Villegas, presenting himself as the Default Operations Manager of BSI, made assertions in this affidavit that were both false and misleading. The BSI Affidavit, which attached a copy of the false promissory note, erroneously claimed that Christiana Trust was the "holder in due course" with the right to enforce the Mortgage Note. It further falsely stated that Valeria Taveras had executed the BSI Note and intentionally denied any evidence of forgery in this document.

139.   As a strategic move within the Enterprise's overarching scheme, on June 25, 2015, the attorney Kyle W. Ohlenschlaeger, from the Law Office of Morris, Lain, Evans, Brock, and Kennedy, filed in the State Court Christiana Trust's Motion to Vacate the Declaratory Judgment (the "CT Motion"). This motion was riddled with false and misleading statements, including unfounded claims about Christiana Trust's legal rights to enforce both the Mortgage and the Mortgage Note, the assertion that Valeria Taveras had signed the BSI Note, and the erroneous declaration that the Mortgage secured the BSI Note.

140.   In a deliberate move to advance their deceptive agenda, the BSI Affidavit not only included an attachment of the counterfeit promissory note, falsely presented as genuine but this affidavit itself was subsequently attached to

the CT Motion. This strategic inclusion of the falsified promissory note, along with the affidavit in the CT Motion, was a calculated effort to lend an air of legitimacy to the fraudulent document, thereby attempting to mislead and manipulate the judicial process with fabricated evidence.

141.   In a concerted effort to defraud and as part of the Enterprise's activities, BSI committed a continuous series of predicate acts of mail fraud, attempting to collect or actually collecting over $400,000 from the Plaintiffs multiple times. The statements mailed to the Plaintiffs were integral to this scheme, aimed at collecting this substantial sum through false and fraudulent pretenses and representations. Additionally, these actions were designed to induce reliance on BSI's misrepresented claims of Christiana Trust's purported interest in the Mortgage.

142.   The materially false statements and representations made by the Enterprise were deliberately crafted to defraud. BSI and Christiana Trust, along with their attorneys, employees, and others acting in concert with them, were fully aware of the falsehood of these representations at the time they were made. Moreover, their intent was to induce The Taveras to act based on these deceptive representations, manipulating their actions and decisions to align with the objectives of the Enterprise's fraudulent scheme.

143.   Christiana Trust's and BSI's representations served as a pivotal influence that significantly affected The Taveras' course of action. These representations had a profound impact on The Taveras' decision to stop

answering the appeal (see Eliezer Taveras' affidavit Composite Exhibit "3").

144.   As a key element of their orchestrated scheme, Christiana Trust filed an Appeal Brief with the 5DCA, in which it falsely represented its interest in the Mortgage and Mortgage Note. Despite being fully aware of the inaccuracy of these claims, Christiana Trust proceeded with these misrepresentations, intentionally misleading the court about the nature of its legal rights and interests. This action was a deliberate attempt to manipulate the judicial process by presenting unfounded claims as factual, thereby advancing the objectives of their fraudulent scheme.

145.   In March 2016, as a direct consequence of these misrepresentations, the 5DCA overturned the Declaratory Judgment. The decision to reverse was influenced, in part, by the misleading assertions presented by Christiana Trust regarding its interest in the Mortgage and Mortgage Note. Additionally, the 5DCA's decision was informed by the precedent set in *U.S. Bank Nat'l Ass'n v. Bartram*, 140 So. 3d 1007, 1013-14 (Fla. 5th DCA 2014), among other factors. This reversal underscored the impact of Christiana Trust's deceptive representations on the appellate court's judgment, and the Bartram Policy, significantly altering the course of the legal proceedings.

146.   The Taveras, operating within the framework of trust and faith in the integrity of legal processes, relied upon the information presented by Christiana Trust, BSI, and its attorneys. The represented facts in the CT Motion, the BSI Affidavit, and the Brief created a narrative that coerced The Taveras into

contemplating and eventually filing in the State Court a notice of voluntary dismissal of the Declaratory Action (the "Notice of Dismissal"). This decision, induced by the pretenses propagated by Christiana Trust, BSI, and other members of the Enterprise, was made in good faith based on the information presented, thereby altering the direction and outcome of the case, granting Christiana Trust a presumed interest in the mortgage and the property.

## THE FIRST VEXATIOUS COMPLAINT

147.   Following their successful strategy to reverse the Declaratory Judgment and dismiss the Declaratory Action, BSI, Christiana Trust, and other collaborators within the Enterprise proceeded to the next phase of their scheme: the acquisition of the Property. This move marked a significant advancement in their orchestrated plan, setting the stage for the subsequent legal maneuvers aimed at securing the Property.

148.   Accordingly, for the purpose of executing, or attempting to execute the Enterprise's scheme to defraud, BSI mailed the false promissory note from its office in Texas to the law office of Greenspoon Marder in Fort Lauderdale, Florida. (See Exhibit "4", proof of mailing included on Christiana Trust's Response to Request for Production of Documents in Foreclosure Case 2016CA000916). This mailing of the falsified note was a critical step in perpetuating the deception.

149.   On April 1, 2006, acting on behalf of Christiana Trust, BSI initiated a foreclosure action in the State Court under Case No. 2016CA000916MF. In this

filing, BSI included the BSI Note as purported 'evidence,' thereby advancing Christiana Trust's claim for mortgage foreclosure. This action represented a pivotal moment in the Enterprise's ongoing fraudulent activities.

150.    The filing of the foreclosure case and the accompanying Notice of Lis Pendens were carried out through the Law Firm of Greenspoon Marder, P.A., who may have never verified the information submitted to the Court or chose to overlook the false documentation presented.[4]

151.    In purported compliance with Fla. Stat. 702.015(4), Alyssa Neufeld, from the law office of Greenspoon Marder, P.A., executed a certification of note possession, asserting that "plaintiff is in possession of the original promissory note upon which this action is brought", attaching a copy of the BSI Note. This action further entrenched the deceptive narrative being presented to the court.

152.    The case was presided over by the Honorable Scott Polodna, with Judge Margaret Schreiber subsequently assigned to oversee the action.

153.    Initially, The Taveras engaged the legal services of attorney Keyth Arago to respond to the foreclosure action. However, in 2008, following certain disagreements with Mr. Arago, The Taveras made the decision to represent themselves, opting to proceed pro se in the legal proceedings.

**THE DISCOVERY OF FORGERY AND SUBSEQUENT ACTIONS**

154.    In April 2008, while meticulously reviewing the foreclosure documents, The Taveras uncovered the forgery and falsity of the BSI Note.

---

[4] Of note, the State Court's records evidence several filings by this law firm, which raise doubts about fraudulent conduct.

Subsequently, they began to formally allege its forgery, bringing this critical issue to the forefront of the legal proceedings.

155.   Throughout the duration of the foreclosure action, The Taveras presented Christiana Trust with compelling evidence of the forgery. This evidence included but was not limited to an affidavit from Valeria Taveras (affirming that she did not sign nor did she authorize anyone to sign the BSI Note on her behalf), and the sworn testimonies of handwriting forensic experts. Thomas Vastrick, a renowned expert in the field, testified that Valeria Taveras had not signed the BSI Note. Similarly, Victor Hernandez, a notary public and former banker, and Charles E. Perrotta, another handwriting expert, both concurred in their testimonies that the signature on the BSI Note was not executed by Valeria Taveras.

156.   Significantly, during the foreclosure action, BSI became embroiled in an investigation and subsequent lawsuit led by the Bureau of Consumer Financial Protection ("CFPB"). This action was initiated due to concerns about BSI's practices in mortgage loan servicing and alleged violations of multiple federal laws. To circumvent potential legal charges, BSI entered into a settlement with the CFPB (the "BSI Settlement") [CFPB File No. 2019-BCPF-006].

157.   Likely influenced by this scrutiny, BSI orchestrated a transfer of the "servicing" in question to Fay and a purported transfer of mortgage to US Trust. It seems proper to infer that this transfer was not conducted in the ordinary course of business but appears to be a calculated move to shield BSI's

questionable practices from the ongoing CFPB investigation and the ramifications of the BANA Consent Judgment and National Mortgage Settlement.

158. For the sake of the scheme to defraud and to deprive a homeowner (The Taveras) of their property, the Enterprise filed, or caused to be filed an assignment of mortgage, falsely representing (a) Christiana Trust legal rights to assign the Mortgage and Mortgage Note; and (b) that the BSI Note is the Mortgage Note.

159. Accordingly, on June 30th, 2017, Meridian Asset Services, Inc. ("Meridian"), ostensibly acting as attorney-in-fact for **Trust 3**, executed and recorded in the Osceola County Public Records (Book 5183, Page 179) another assignment of mortgage (referred to as the "Meridian Assignment"). The assignment indicated that Trust 3, in exchange for 'good and valuable consideration,' had granted, assigned, and transferred to US Trust the Mortgage and a specific note (See Exhibit "5").[5]

160. In 2018, almost a year after Meridian filed the Meridian Assignment, The Taveras filed a motion seeking leave to file an amended answer to the foreclosure complaint. Within this document, they highlighted the error in the Meridian Assignment, specifically the use of Trust 3 as the assignee. This revelation exposed a significant discrepancy in the documentation process.

161. Upon realizing this 'error' in the Meridian Assignment, Meridian, US Trust, and the attorneys of record took steps to amend the situation. Meridian,

---

[5] See *Supra* Footnote "3", argument about the previous use of Trust 3.

this time claiming to act as attorney-in-fact for Christiana Trust, registered a corrective assignment of mortgage (the 'Meridian Corrective'). However, this move raises serious concerns, including potential notary fraud and the submission of a perjured document. Notably, the Meridian Assignment was dated as if it had been executed prior to The Taveras filing their motion for leave, suggesting that it was executed retroactively. This backdating implies a deliberate attempt to fabricate the timeline of events, further undermining the credibility of the documents and the parties involved.

162.   Furthermore, the documents (the assignment and corrective), contain several misrepresentations: (a) they falsely represent Christiana Trust's legal authority to transfer the Mortgage and Mortgage Note; (b) they incorrectly identified the BSI Note as the actual Mortgage Note; and (c) they erroneously attributed liability to Valeria Taveras for the BSI Note.

163.   The nature of the "error" in the Meridian Assignment, using Trust 3 as the assignee, sheds light on the severity of the situation. It becomes clear that this was not a mere clerical mistake or an oversight. Rather, it appears to be a deliberate act of malfeasance. This repeated misassignment, under the guise of a correction, suggests a pattern of illegal conduct, encompassing elements of perjury and notary fraud. The actions of Meridian and the attorneys of records, particularly in the context of the supposed corrective assignment, reveal a troubling disregard for legal processes.

164.   The fact that the same mistake was repeated in the supposed

assignment, raises serious questions about the intentions behind these actions. The involvement of false statements and the manipulation of notarial processes not only undermine the integrity of the mortgage assignment but also potentially violate legal and ethical standards. Upon information and belief, US Trust's attorneys played an important role in these issues.

165.   In February 2020, after leave of Court, and despite being fully aware that their promissory note was falsified, and despite The Taveras's discovery proof of the forgery, the US Trust's attorneys proceeded with a bold and legally contentious move. Demonstrating a complete disregard for the rule of law, filed the First - perjured - Amended Complaint. This action was not just a mere continuation of the legal process, but a deliberate decision to persist in a course of action that was increasingly questionable from a legal and ethical standpoint.

166.   The first Amended Complaint, tainted by perjury, contains a series of false and misleading statements and representations. Among these inaccuracies is the assertion that Valeria Taveras executed the forged note, and misrepresenting that US Trust was the holder in due course of the Mortgage Note, claims known to be untrue by those involved.

167.   Despite this awareness, US Trust and its attorneys proceeded with a questionable and legally dubious action: they requested an employee of Fay to verify the complaint. This act of verification, performed under the risk of perjury, effectively constitutes an act of perjury itself, in direct violation of Florida and/or Texas law. By asking the employee to attest to the truthfulness of a document

they knew contained falsehoods, US Trust and the attorneys not only compromised the integrity of the legal process but also placed the employee in a position of legal vulnerability, further exacerbating the ethical and legal transgressions in this case.

168.    Furthermore, the Amended Complaint was particularly notable for its attachments: once again, the false promissory note was presented as supporting evidence. This decision to re-submit a document already known to be forged was a blatant dismissal of legal integrity and due process. Additionally, the Amended Complaint included the Meridian Corrective, which itself contained false and misleading information and representations. The inclusion of these documents in the Amended Complaint was not just a procedural step, but a clear indication of the US Trust's and its attorneys' willingness to use deceptive means in their pursuit of the case.

169.    By attaching documents known to be false and misleading, US Trust and its attorneys not only undermined their own credibility but also the integrity of the judicial process as a whole.[6]

170.    On June 2, 2017, the CFPB filed an enforcement action against Fay (Administrative Proceeding File No. 2017-CFPB-0014), culminating in a directive for Fay to cease illegal foreclosure practices and pay up to $1.15 million in restitution ("Fay Settlement").

---

[6] This is true, especially considering what happened in the State Court after this. The present lawsuit serves as a critical call to the United States legal system, spotlighting the State Court's alarming indifference to grave misconduct. The filing of this Amended Complaint underscores a blatant disregard for ethical standards and the sanctity of the judicial process. This case not only challenges the conduct of US Trust and its legal representatives but also seeks to draw attention to the necessity for heightened scrutiny and accountability within the legal system.

171.   In a strategic move, the servicing of the Mortgage was transferred to Rushmore in May 2020.

172.   The strategic transfer of mortgage servicing from Fay to Rushmore, occurring amidst Fay's scrutiny by the CFPB, exemplifies a recurring pattern of behavior among these corporations. This maneuver, particularly in light of the CFPB's enforcement action against Fay resulting in the Fay Settlement, underscores a deliberate strategy to evade legal accountability and conceal unlawful activities.

173.   The timing and nature of this transfer, coinciding with heightened regulatory scrutiny and legal directives for Fay to cease illegal foreclosure practices, strongly suggest an orchestrated effort to shield corporate malfeasance. Such tactics not only raise serious questions about the integrity of these corporations' operations but also highlight a systematic approach to sidestep legal consequences, further entrenching their involvement in questionable and potentially illicit schemes.

174.   Furthermore, this action, along with similar settlements involving BANA and BSI, suggests a pattern of avoiding legal repercussions for potentially unlawful actions by these corporation's employees and directors.

175.   On May 12, 2020, Rushmore mailed Defendants its Notice of Assignment, Sale, or Transfer of Servicing. The Taveras responded to Rushmore's Notice of Assignment with a **dispute letter under the Fair Debt Collection Practice Act** (FDCPA), asserting the BSI Note's forgery with supporting

evidence, including Valeria Taveras' affidavit. Rushmore's disregarded the dispute and the court's records of the alleged forgery.

176. US Trust's attorneys, particularly Shawn Rader, proceeded with actions in stark disregard for legal ethics, despite being aware of The Taveras' allegations and reliable evidence demonstration forgery.

177. This included redacting the Second Amended Complaint and presenting it for verification under oath to Anthony Younger, an employee of Rushmore, ignoring substantial evidence challenging document authenticity. This deliberate and conscious act, carried out by legal representatives, flagrantly disregards the fundamental tenets of the rule of law and legal professional conduct, casting a shadow of doubt on the integrity and ethical standards guiding their representation in this matter.

178. The Second Amended Complaint contains grievously false statements and representations that are of material significance, notably asserting that (1) Valeria Taveras executed the BSI Note; (2) representing that US Trust is a holder in due course of the Mortgage Note; (3) and that US Trust was legally assigned the Mortgage and the Mortgage Note. This crucial allegation, central to the entire premise of the case, is demonstrably erroneous and misleading. The inclusion of such materially false statements not only misrepresents the facts but also undermines the foundation upon which that legal action is built.

179. Further, the Second Amended Complaint relies on the BSI Note and